TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
ROBERT R. AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
DEBORAH DE VILLA (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile: (310) 474-858

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARTIN BENNETT and BRIAN WELIKSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR NORTH AMERICA, INC. and TOYOTA MOTOR SALES, U.S.A., INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Martin Bennett and Brian Welikson ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against Defendants Toyota Motor North America, Inc. and Toyota Motor Sales, USA., Inc. (collectively, "Toyota" or "Defendants").

## NATURE OF THE ACTION

1.     Plaintiffs bring this action on behalf of themselves and on behalf of all similarly situated persons in the United States who purchased or leased any of the following Toyota and Lexus branded vehicles which were manufactured with a 3G modem, an obsolete piece of telematics equipment, for the indicated model years: Toyota Sienna model years 2011-2017, Toyota Prius v model years 2012-2016, Toyota Avalon/HV model years 2013-2018, Toyota RAV4 EV model years 2012-2014, Toyota Prius Plug-in model years 2012-2015, Toyota Camry/HV model years 2013-2017, Toyota Mirai model years 2016-2017, Toyota Prius model years 2010-2016, Toyota Highlander/HV model years 2014-2017, Toyota Land Cruiser model years 2011-2017, Toyota 4Runner model years 2010-2019, Lexus GX model years 2010-2018, and all other Lexus models years 2010-2017 (the "Class Vehicles").[1]

2.     As alleged herein, the Class Vehicles have a telematics system that requires wireless network connectivity to remain wholly operable. However, due to Defendants' decision to equip the Class Vehicles with obsolete telematics equipment, many of the Class Vehicles' internet enabled features—such as collision notification and roadside assistance safety features—have become inoperable because the Class Vehicles' internet enabled features no longer are supported by 3G wireless compatibility which has been discontinued.

3.     The decision by Defendants to cut 3G connectivity will have stark financial

---

[1]     Plaintiffs reserve the right to modify the vehicles comprising the Class Vehicles as the case proceeds through discovery.

consequences for the class members. Additionally, it spells the loss of certain 3G-dependant safety features during vehicle operation. This poses a significant safety hazard to drivers and occupants of Class Vehicles, and other members of the public, because disconnecting 3G compatibility has now "bricked" important safety features in the Class Vehicles.

4. This result is the consequence of Defendants' decision to incorporate telematics equipment—the proper functioning of which was contingent upon continued viability of 3G services—that were inevitably and foreseeably subject to termination.

5. Defendants are and have been aware of the risks of equipping the Class Vehicles with telematics equipment that rely upon 3G wireless services to operate. Nevertheless, Defendants designed and produced, and continued to design and produce, the Class Vehicles with telematics equipment that they knew would soon be obsolete.

6. Making matters worse, now that the telematics equipment is obsolete, Defendants are forcing Class Vehicle owners to pay to rectify the issue, namely by charging class members to upgrade the telematics technology in impacted vehicles. Furthermore, when owners and lessees of the Class Vehicles seek an upgrade of the telematics equipment to maintain the roadside emergency safety features and other features available through Lexus Enform, Toyota Safety Connect, or Entune App ("Mobile Apps"), they often find that the upgrade does not work.

7. Prior to selling the Class Vehicles, Defendants knew that the operability of the telematics equipment installed in the Class Vehicles hinged on the availability of 3G services.

8. The Class Vehicles' internet enabled features and services, such as roadside emergency safety features and other features available through the Mobile Apps, were rendered inoperable because of the 3G phase out in 2022 due to Defendants' installation of obsolete telematics equipment in the Class Vehicles.

9. The telematics systems in Class Vehicles no longer adequately function, and Defendants omitted information about the inevitable and premature termination of internet-

enabled services offered in Class Vehicles at the time of sale.

10.    Because of Defendants' decision to equip the Class Vehicles with internet enabled features and services that prematurely become inoperable and their refusal to upgrade Class Vehicles to maintain telematics capabilities, Plaintiffs and class members are unable to utilize their Vehicles' telematics equipment and its safety features.

11.    As a result of Defendants' misconduct, Plaintiffs and class members have been damaged and were injured on account of receiving Vehicles that were fundamentally different from what they believed they were purchasing and obtained Vehicles that are less valuable than what they paid to purchase the Vehicles.

12.    This action is brought to remedy violations of law in connection with Defendants' manufacture, marketing, advertising, selling, warranting, and servicing of the Class Vehicles.

13.    On behalf of the putative class members, Plaintiffs bring claims for breaches of express warranty and implied warranty, fraudulent omission, unjust enrichment, violations of Consumers Legal Remedies Act, violations of the Unfair Competition Law, and violations of the New York General Business Law ("GBL") § 349.

14.    The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

## JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2)(A) because this matter was brought as a class action under Fed. R. Civ. P. 23, at least one proposed class member is of diverse citizenship from Defendants, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), excluding interest and costs.

16.    The Court has personal jurisdiction over each Defendant and venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this District, Defendants are incorporated in this

District, and Defendants conduct substantial business in this District

17. At all pertinent times, Defendants were engaged in the marketing, advertisement, sale, and lease of the Class Vehicles, which are the subject of this lawsuit, in this District and throughout the United States.

**PARTIES**

**Plaintiffs**

### *Plaintiff Martin Bennett*

18. Plaintiff Martin Bennett is an adult citizen of Danville, California. In or around June 2017, Plaintiff purchased a new 2017 Lexus RX350, from Lexus at Concord, an authorized Lexus dealership in Concord, California. Plaintiff Bennett uses his Class Vehicle for family and household use.

19. In or around October 2022, Plaintiff Bennett lost the ability to utilize the features of Lexus Enform.

20. Because of the termination of 3G-supported services, and Defendants' inability or refusal to remedy the issue, Plaintiff Bennett irrevocably lost key safety features in his Class Vehicle.

21. At the time of purchasing his Vehicle, Plaintiff did not know that the Vehicle was equipped with a 3G modem that would prematurely fail and cause internet enabled features and services to become inoperable. Had Defendants disclosed this on their websites, through their dealerships, in their warranty manuals, or elsewhere prior to Plaintiff purchasing his Class Vehicle, Plaintiff Bennett would not have purchased the Vehicle, or would not have paid the purchase price that he did. Plaintiff relied upon Defendants that they were providing the full picture of information regarding his Vehicle, and relied upon the idea that Defendants would not withhold material information about the Vehicle. As a result, Plaintiff received less than what he paid for his Vehicle and did not receive the benefit of his bargain.

### *Plaintiff Brian Welikson*

22. Plaintiff Brian Welikson is an adult citizen of Piermont, New York. In or

around August 2018, Plaintiff purchased a used 2017 Lexus NX200t, from Ray Catena Lexus, an authorized Lexus dealership in White Plains, New York. Plaintiff Welikson uses his Class Vehicle for family and household use.

23. Plaintiff Welikson decided to purchase Lexus NX200t largely due to the features offered by Lexus Enform, such as Remote Engine Start, Vehicle Finder, Guest Driver Monitor, and several safety features.

24. In or around October 2020, Plaintiff received a letter from Defendants informing him that his vehicle would no longer operate the functions of the Lexus Enform after October 31, 2022, due to the decommissioning of 3G infrastructures.

25. In or about November 2020, Plaintiff Welikson called his local dealer to get more information and to schedule an appointment to upgrade his vehicle's modem so he can continue using the features of Lexus Enform. However, the representatives at the dealership were unable to provide any information.

26. Several months later, Plaintiff Welikson spoke with a dealership representative in person to inquire about the same matter. A representative stated that there was not much Plaintiff Welikson could do to preserve the functions that motivated him to purchase his vehicle in the first place and that Plaintiff Welikson should purchase a newer model if he wants to use Lexus Enform's internet-enabled features.

27. In or around October 2022, Plaintiff Welikson lost use of the Lexus Enform's functions.

28. Because of the termination of 3G-supported services, and Defendants' inability or refusal to remedy the issue, Plaintiff Welikson irrevocably lost key safety features in his Class Vehicle.

29. At the time of purchasing his Vehicle, Plaintiff did not know that the Vehicle was equipped with a 3G modem that would prematurely fail and cause internet enabled features and services to become inoperable. Had Defendants disclosed this issue on their websites, through their dealerships, in their warranty manuals, or elsewhere prior to Plaintiff purchasing his Class Vehicle, Plaintiff Welikson would not have purchased the

Vehicle, or would not have paid the purchase price that he did. Plaintiff relied upon Defendants that they were providing the full picture of information regarding his Vehicle, and relied upon the idea that Defendants would not withhold material information about safety concerns in the Vehicle. As a result, Plaintiff received less than what he paid for his Vehicle and did not receive the benefit of his bargain.

**Defendants**

30.    Defendant Toyota Motor North America, Inc. ("TMNA) is a California corporation headquartered in Plano, Texas. TMNA operates as a wholly owned subsidiary of Toyota Motor Corporation ("TMC"), a Japanese entity, and is the corporate parent of Toyota Motor Sales, U.S.A., Inc. TMNA oversees government and regulatory affairs, energy, economic research, philanthropy, corporate advertising, and corporate communications for all of Toyota Motor Corporation's North American operations. TMNA is in the business of designing, engineering, testing, validating, manufacturing, marketing, and selling Toyota and Lexus branded vehicles throughout the United States.

31.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a California corporation headquartered in Plano, Texas. TMS is TMNA's domestic sales and marketing division, which oversees sales and other operations across the United States. TMS distributes Toyota parts and vehicles, which are then sold through a network of dealers. Money received from the purchase of a Toyota vehicle from a dealership flows from the dealer to TMS.

32.    Lexus is a wholly owned brand and/or division of Toyota. Toyota employs engineering, legal, compliance, and regulatory personnel to make decisions regarding the subject Lexus vehicles. These employees, on behalf of TMC and TMNA, ultimately made or ratified the decisions that allowed the subject Lexus vehicles to be fraudulently designed, manufactured, marketed, and sold.

33.    Defendants' warranty manuals for the vehicle make no mention of the fact that Defendants installed an inferior 3G modem in their vehicles. At the time of their vehicle purchases, Plaintiffs were not informed by Defendants that their vehicles were

equipped with 3G modems. 3G modems were not disclosed by Defendants' authorized dealerships, on vehicles' window stickers, or elsewhere at the time Plaintiffs purchased their vehicles.

## FACTUAL BACKGROUND

### A.    OVERVIEW OF TOYOTA AND LEXUS

34.    Toyota entered the United States market after the establishment of Toyota Motor Sales, U.S.A., Inc. in Hollywood, California in 1957. By 1975, Toyota became the number one import brand in the United States.

35.    In 1987, Toyota announced Lexus as a second sales channel in the United States. By 1991 and 2000, Lexus became the leading luxury import and leading luxury brand in the United States, respectively.

36.    Toyota directly employs more than 39,000 people in the United States who have contributed to the design, engineering, and assembly of nearly 32 million cars and trucks at nine manufacturing plants.[2]

### B.    OVERVIEW OF 3G NETWORKS IN AUTOMOBILES

37.    In late 2000s, manufacturers began equipping vehicles with internet-enabled telematics that offered features for increased convenience and enhanced safety.

38.    In 2009, Toyota introduced its subscription-based telematics system, Safety Connect, which provides services, including but not limited to, communication, roadside assistance, safety, and remote diagnostics.

39.    In 2009, Lexus announced the introduction of Lexus Enform, its all-new proprietary telematics system which offered services in addition to Safety Connect.[3]

40.    Lexus Enform and Safety Connect provide critical safety functions that

---

[2]    *Toyota and Lexus Announce Associates Accessory Products at SEMA Show*, Toyota Newsroom (Nov. 1, 2022), https://pressroom.toyota.com/toyota-and-lexus-announce-associated-accessory-products-at-sema-show/.
[3]    *Toyota Motor Sales Announces Lexus Enform With Safety Connect*, Lexus Newsroom (July 28, 2009), https://pressroom.lexus.com/toyota-motor-sales-announces-lexus-enform-with-safety-connect/.

include Automatic Collision Notification, Stolen Vehicle Location, Emergency Assistance Button, and Enhanced Roadside Assistance.

41.     Defendants contracted with cellular service providers to provide access to their 3G network for the modems installed in the Class Vehicles.

42.     As mobile carriers seek to upgrade their networks to use the latest technologies, they periodically shut down older outdated services, such as 3G, to free up spectrum and infrastructure to support new services, such as 5G. Similar transitions have happened before. For example, some mobile carriers shut down their 2G networks when they upgraded their networks to support 4G services. Mobile carriers have the flexibility to choose the types of technologies and services they deploy, including when they decommission older services in favor of newer services to meet consumer demands.

## C.     SUNSETTING OF THE 3G NETWORK IN TOYOTA AND LEXUS VEHICLES

43.     Manufacturers of 3G devices have long known that 3G was inefficient and would be phased out as early as possible. In January 2008, the FCC auction for 700 MHZ spectrum began with Version Wireless and AT&T winning the biggest share after having stated their intentions to support LTE a/k/a 4G LTE. Automakers, like Defendants, were aware of this too.

44.     The sunsetting of 3G was long foreseeable. For example, Verizon first introduced and expanded to national scale its 3G network in 2002-2004. This was followed by the launch of its 4G LTE service on December 5, 2010. Then, as early as October 2011, Verizon's VP of global strategy Aparna Khurjekar publicly stated in an interview to FierceWireless that Verizon has tentatively set 2021 for the retirement of 2G and 3G network.[4] Khurjekar added that this deadline intends to serve enterprises as a guideline to prepare for the inevitable retirement of 3G network. In or around 2016, Verizon publicly

---

[4]     Kimberly Streams, *Verizon tentatively plans to retire 2G and 3G CDMA networks by 2021*, The Verge (Oct. 11, 2022), https://www.theverge.com/2012/10/11/3488546/verizon-sunset-2g-3g-cdma-2021.

announced 2019 as the deadline to sunset 3G, yet later extended that to 2020 and most recently to 2022.[5] On March 30, 2021, Verizon finally announced that their 3G wireless network would be shut down at the end of 2022 in order to make way for the deployment of its 5G network.[6]

45.     Defendants knew or should have known when they manufactured the Class Vehicles that 3G networks would be retired before the end of the usable life of the Class Vehicles and/or while the Class Vehicles were still under warranty.

46.     Despite the inevitability of the decommissioning of 3G network infrastructure, and several public announcements concerning it, Defendants continued to manufacture the Class Vehicles with modems that only supported 3G.

**D.      TOYOTA ANNOUNCES THE END OF 3G CONNECTIVITY IN THE CLASS VEHICLES**

47.     In or around October 2020, Defendants mailed a letter to the owners or lessees of Class Vehicles informing them of the termination of several key features provided by the Mobile Apps.

48.     On October 26, 2022, Lexus published a Service Update on its website outlining the terminated services and listing the vehicles that will be affected, as depicted below[7]:

---

[5]     Mike Haberman, *3G CDMA Network Shut off date set for December 31, 2022, Verizon News Center*, https://www.verizon.com/about/news/3g-cdma-network-shut-date-set-december-31-2022.

[6]     *Id.*

[7]     *3G Wireless Update*, Lexus (Oct. 26, 2022), https://support.lexus.com/s/article/3G-Wireless-Services-10537.



EXPERIENCE AMAZING



🔍 SEARCH FAQS

🏠 **Home**

## 3G WIRELESS SERVICES UPDATE

🕐 **Oct 26, 2022**

**What is happening?**

As wireless technology continues to evolve, telecommunications providers in North America are making significant changes to their legacy communications infrastructures and network capabilities. Certain telecommunications providers have elected to terminate 3G wireless services, which will impact available services for motor vehicles. This affects certain 2010-2018 Lexus Vehicles reliant on these 3G networks to provide **Lexus Enform** subscription services.

**Why is this happening?**

Telecommunications providers are discontinuing 3G services in favor of newer and more advanced LTE networks. Although these circumstances were created by factors beyond our control, we sincerely regret any inconvenience this may cause.

**How does this impact Lexus vehicles?**

As of October 31, 2022, at 11:59PM CST, the following available Lexus Enform subscription services will be terminated on select 2010-2018 vehicles:

- **Lexus Enform Safety Connect** including Automatic Collision Notification, Enhanced Roadside Assistance, Emergency Assistance Button and Stolen Vehicle Locator
- **Lexus Enform Remote** including Remote Engine Start/Stop, Door Lock/Unlock, Vehicle Finder, Guest Driver Monitor, Vehicle Status and Alerts, Key Fob Remote Start, and Integration with Alexa® and The Google Assistant
- **Lexus Enform Destination Assist** including 24-hour live response center agent
- **Lexus Enform Service Connect** including Vehicle Health Report, Vehicle Alerts, and Maintenance Alerts

CLASS ACTION COMPLAINT

What are the impacted models for Lexus?

| Impacted Services | Impacted Lexus Vehicles | Termination Date |
|---|---|---|
| Lexus Enform Safety Connect | 2010-2017 all models[2]; 2018 GX | October 31, 2022, 11:59PM CST |
| Lexus Enform Destination Assist | 2010-2017 all models[2,3]; 2018 GX[3] | October 31, 2022, 11:59PM CST |
| Lexus Enform Remote | 2015[1]; 2016-2017 all models[2]; 2018 GX | October 31, 2022, 11:59PM CST |
| Lexus Enform Service Connect | 2016-2017 all models[2]; 2018 GX | October 31, 2022, 11:59PM CST |

[1]2015 Model Year: GS, LS, RC, IS (excluding IS C), ES & NX (navigation equipped vehicles)
[2]Excludes 2016-2017 CT 200h with Standard Audio System
[3]Requires Navigation Package

When does this go into effect?
Any active Lexus Enform subscription services on the affected vehicles will be terminated as of October 31, 2022, at 11:59 PM.

49.　　The update states that "Certain telecommunications providers have elected to terminate 3G wireless services, which will impact . . . certain 2010-2018 Lexus Vehicles reliant on these 3G networks to provide Lexus Enform subscription services."[8]

50.　　Despite their advanced knowledge of the inevitability of the 3G infrastructure and their ability to plan upgrades for Class Vehicles with that foresight, Defendants claim that "these circumstances were created by factors beyond our control."[9]

51.　　Sometime in 2021, Toyota published a bulletin on its website outlining the terminated services and listing the vehicles that will be affected, as depicted below:[10]

---

[8]　*Id.*
[9]　*Id.*
[10]　Safety Connect®* – Future Disablement of Vehicle Wireless Network, Toyota, https://www.toyota.com/audio-multimedia/support/3g-faq/ (last accessed on Nov. 7,

CLASS ACTION COMPLAINT

# Safety Connect® * – Future Disablement of Vehicle Wireless Network

**What is happening?**

As wireless technology continues to evolve, telecommunications providers in North America are making significant changes to their legacy communications infrastructures and network capabilities. As part of this process, these third-party providers have elected to discontinue the provision of 3G wireless services. This means that devices and services that currently require 3G wireless networks to function, including hardware installed in motor vehicles, will no longer work by the end of 2022.

**Why is this happening?**

Telecommunications providers are discontinuing 3G services in favor of newer and more advanced LTE networks. Although these circumstances were created by factors beyond our control, we sincerely regret any inconvenience this may cause.

**How does this impact Toyota vehicles with Safety Connect®?**

Toyota Safety Connect® * will no longer function as of November 1, 2022. Affected Safety Connect® services include Automatic Collision Notification, Enhanced Roadside Assistance, * Emergency Assistance Button and Stolen Vehicle Locator. *

**How does this impact Toyota EV and Hydrogen Fuel Cell Vehicles?**

The Charge Management, ECO Dashboard, Remote Climate * and Vehicle Finder * capabilities included in the Entune® App Suite * will also no longer be supported as of November 1, 2022. This is only applicable to the Prius Plug-in, RAV4 EV and Mirai. See Impacted model chart below.

2012–2014 Toyota RAV4 EV
2012–2015 Toyota Prius Plug-in
2016–2017 Toyota Mirai

**Is there a retrofit option to retain Safety Connect® services?**

There are no available retrofit options.

**When does this go into effect?**

On November 1, 2022.

**Is there an impacted Toyota model chart for Safety Connect®?**

2011–2017 Toyota Sienna
2012–2016 Toyota Prius *v*
2013–2018 Toyota Avalon/HV
2012–2014 Toyota RAV4 EV
2012–2015 Toyota Prius Plug-in
2013–2017 Toyota Camry/HV
2016–2017 Toyota Mirai
2010–2016 Toyota Prius
2014–2018 Toyota Highlander/HV
2011–2017 Toyota Land Cruiser
2010–2019 Toyota 4Runner

Note: Safety Connect® varies by model.

2022).

CLASS ACTION COMPLAINT

52.    The bulletin states "devices and services that currently require 3G wireless networks to function, including hardware installed in motor vehicles, will no longer work by the end of 2022."

53.    The safety concerns caused by the termination of 3G-enabled services to owners and lessees of Class Vehicles are further highlighted in Toyota's response to the FAQ posted in the same bulletin, as depicted below:[11]

> **What happens if I am involved in a collision or require emergency services on or after November 1, 2022?**
> Safety Connect® * will no longer function as of October 31, 2022, at 11:59 p.m. CST. As of that date, Automatic Collision Notification, Enhanced Roadside Assistance, * Emergency Assistance Button and Stolen Vehicle Locator * will no longer be available.

54.    Defendants installed 3G capable telematics systems in Class Vehicles that could not be upgraded or adapted to next generations of wireless technology. Within the mobile connectivity industry, a generation typically refers to a fundamental improvement in the nature of the wireless network which may involve different frequency bands, higher peak bit rates, or non-backwards compatible transmission technology.

**E.    AS A RESULT OF THE SUNSETTING OF 3G NETWORK, CLASS VEHICLES LOSE INTERNET CONNECTIVITY CAUSING CRITICAL SAFETY FEATURES IN THE CLASS VEHICLES UNUSABLE**

55.    Class Vehicles' critical safety features and accompanying Mobile Apps use the vehicles' onboard wireless module, or modem, to communicate with the secure cloud services through cellular technology.

56.    The Mobile Apps allow you to start, lock, unlock, and locate the vehicle remotely. The Mobile Apps also connect you with other vehicle resources like a parking locator, roadside assistance, and dealer locations.

57.    The internet-enabled telematics systems on Class Vehicles provide crucial safety features to expedite medical assistance in cases of emergency with Automatic Collision Notification, Enhanced Roadside Assistance, Emergency Assistance Button and Stolen Vehicle Locator. In recognition of the importance of the theft and safety features,

---

[11]    *Id.*

most insurance carriers offer vehicle owners preferential rates for vehicles with those features.

58.     For electric and hydrogen fuel cell vehicles, the Mobile Apps allow the owner to check the vehicle's battery charge level and total range, and to schedule the time of day the vehicle charges its battery in order to take advantage of when electricity prices are at their lowest.

59.     Due to the termination of services that provide critical safety features, Plaintiffs and class members are stripped of safety measures and precautions.

60.     Defendants refused to make available a 4G upgrade kit installation as a warranty repair or otherwise cover all costs associated with the upgrade of the 3G modem for Class Vehicles. As a result of Defendants' misconduct, Plaintiffs and the other class members were each injured on account of receiving Class Vehicles that were fundamentally different from what they believed they were purchasing, less valuable than was represented, and less valuable than what they actually received.

## TOLLING OF STATUTES OF LIMITATIONS

61.     Defendants had exclusive knowledge of the nature of the Class Vehicles' 3G modems, i.e., that numerous features would cease operating when 3G networks were decommissioned, and Defendants knew that this planned phasing out would not be discovered by Plaintiffs and class members unless and until the disconnection occurred. Only Defendants had access to information about the decision to decommission the 3G network, including through communications with cellular providers regarding the eventual decommissioning of its 3G network, and Defendants' general knowledge of the telecommunications industry's upgrade to 4G and 5G technology.

62.     Since the Plaintiffs could not have learned of the planned phasing out of the 3G network until the 3G network was decommissioned, Plaintiffs and class members exercising due diligence were not reasonably able to discover the issue until after purchasing the Class Vehicles. Plaintiffs and class members could not reasonably have been expected to learn of or discover Defendants' omissions of material information

concerning the Class Vehicles until after the phaseout was announced and only then because they would be forced to research what had happened to their Vehicles. Therefore, the discovery rule applies to all claims asserted by Plaintiffs and class members.

63.  Defendants have known about this issue since at least 2016 when cellular service providers began making announcements regarding sunsetting of their 3G network, if not earlier, and has failed to alert class members.

64.  Thus, any applicable statute of limitations have been tolled by Defendants' actions and Defendants are estopped from pleading the statute of limitations because they failed to disclose facts they were obligated to disclose.

## CLASS ALLEGATIONS

65.  This action is brought as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the class(es) defined as follows:

**Nationwide Class**

All persons and entities in the United States that purchased or leased a Class Vehicle for end use and not for resale.

66.  In the alternative, Plaintiffs seek certification of the following classes:

**California Class**

All persons and entities in the state of California that purchased or leased a Class Vehicle for end use and not for resale.

**New York Class**

All persons and entities in the state of New York that purchased or leased a Class Vehicle for end use and not for resale.

67.  Excluded from the Class are: (i) Defendants and their officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all class members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

68.  Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the

same evidence as would be used to prove those elements in individual actions alleging the same claims.

69. **Numerosity:** The members of the Class are so numerous that joinder of all class members in a single proceeding would be impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that tens of thousands of Class Vehicles affected by the issues alleged herein have been sold and leased nationwide.

70. **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all class members and predominate over questions affecting only individual class members. Such common questions of law or fact include, *inter alia*:

    a.    whether Defendants engaged in the conduct alleged herein;

    b.    whether Defendants omitted and misrepresented material facts to purchasers and lessees of Class Vehicles;

    c.    whether Defendants' omissions and misrepresentations regarding the Class Vehicles were likely to mislead a reasonable consumer;

    d.    whether Defendants breached warranties with Plaintiffs and the other class members when they produced, distributed, and sold the Class Vehicles;

    e.    whether Plaintiffs' and the other class members' Class Vehicles were worth less than as represented as a result of the conduct alleged herein;

    f.    whether Plaintiffs and the other class members have been damaged and, if so, the extent of such damages; and

    g.    whether Plaintiffs and the other class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

71. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

72.    **Typicality:** Plaintiffs' claims are typical of the claims of the other class members because, among other things, Plaintiffs and the other class members were injured through the substantially uniform misconduct described above. Like Plaintiffs, class members also purchased or leased Class Vehicles containing planned-to-be-obsolete telematics systems. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other class members, and no defense is available to Defendants that are unique to Plaintiffs. The same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all class members. Plaintiffs and all class members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct in selling/leasing and failing to remedy the Class Vehicles with telematics systems that would be phased out.

73.    **Adequacy:** Plaintiffs are adequate Class representatives because they will fairly represent the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including consumer fraud and automobile defect class action cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class they represent and have the resources to do so. Neither Plaintiffs nor their counsel have interests adverse or antagonistic to those of the Class.

74.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for class members to individually seek redress for Defendants' wrongful conduct. Even if class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By

contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

75. Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Defendants maintain regarding their sales and leases of Class Vehicles.

## CAUSES OF ACTION

### COUNT I
**Breach of Express Warranty**
**(On Behalf of Plaintiff Welikson and the Classes)**

76. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

77. This claim is brought by Plaintiff Welikson on behalf of the Nationwide Class and the New York Class.

78. Defendants' New Vehicle Limited Warranty provides that "This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Lexus, subject to the exceptions indicated under 'What Is Not Covered….'"[12] General Warranty Provisions indicate that "[r]epairs and adjustments covered by these warranties are made at no charge for parts and labor."[13]

79. Plaintiffs' and the other class members' Class Vehicles did not perform as promised and contained a flawed or inadequate modem which was nonfunctional after the decommissioning of the outdated 3G network. This issue was and should have been covered under the New Vehicle Limited Warranty.

---

[12] Items listed within What Is Not Covered do not include defects alleged in this Complaint. *See, 2017 Lexus NX 200t Warrant and Services Guide*, https://assets.sia.toyota.com/publications/en/omms-s/L-MMS-17NX200T/pdf/L-MMS-17NX20TH.pdf.

[13] *Id.*

80.     Defendants breached the terms of the express warranties with Plaintiffs and other class members by not providing the Class Vehicles with properly functioning modems and failing to repair or remedy the issue at Defendants' cost.

81.     Plaintiff Welikson sought repair of their vehicles during the warranty period and Defendants refused to make a repair without payment.

82.     As the foreseeable and actual result of Defendants' breaches of express warranty, Plaintiffs and the other class members were damaged in an amount that is the difference between the value of the Class Vehicles if they had possessed a modem capable of functioning without a 3G network and performed as represented and the value of the vehicles they actually received.

83.     Plaintiffs and the other class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT II
### Breach of Implied Warranty of Merchantability
### (On Behalf of Plaintiffs and the Classes)

84.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

85.     This claim is brought by Plaintiffs on behalf of the Nationwide Class and the New York and California Classes.

86.     Defendants are and was at all relevant times a merchant with respect to the Class Vehicles, and manufactured, distributed, warranted and sold the Class Vehicles.

87.     A warranty that the Class Vehicles, and their telematics equipment, were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

88.     Plaintiffs and the other class members purchased the Class Vehicles manufactured and sold by Defendants in consumer transactions.

89.     The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars with installed telematics equipment are used because the inevitable decommissioning of the 3G networks would render the vehicle modem nonfunctional. The Class Vehicles left Defendants' possession and control with a modem of such a quality that rendered the Vehicles unmerchantable and unfit for ordinary use. Plaintiffs and the other class members used their Class Vehicles in the normal and ordinary manner for which Class Vehicles were designed and advertised.

90.     Defendants knew before the time of sale to Plaintiffs and the other class members, or earlier, that the Class Vehicles were produced with a modem that was unfit for ordinary use and that would be decommissioned, which falls well short of an objective minimum standard of quality. This knowledge was based on Defendants' own knowledge of the decommissioning of 3G network their modems relied on, its decision to include an alternate 4G modem in other vehicle models produced around the same time, the industry standard practice of making vehicle features that would not be affected by the 3G network shutdown, and Defendants' general knowledge regarding the manufacture of their vehicle modems and integrated systems and software.

91.     Plaintiffs' and other class members' modems and the Class Vehicles are, and at all times were, not of fair or average quality, nor would they pass without objection.

92.     All conditions precedent have occurred or been performed.

93.     Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known issue with the 3G modems. Defendants knew when they first made these warranties and their limitations that the issue existed, and the warranties might expire before a reasonable consumer would notice or observe that the outdated 3G network was decommissioned. Defendants also failed to take necessary actions to adequately disclose or cure the issue after it came to the public's attention and sat on their reasonable opportunity to cure or remedy the problem,

their breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the issue or cure their breaches of warranty.

94.     Plaintiffs and the other class members had sufficient direct dealings with Defendants and their agents (dealers) to establish privity of contract between themselves and Defendants. As alleged *supra,* Plaintiffs and class members purchased their Class Vehicles from Toyota and Lexus dealerships. The Class Vehicles were purchased with the New Vehicle Limited Warranty. Defendants and Plaintiffs and the other class members are in privity because of the existence of the New Vehicle Limited Warranty, which Defendants extend to Plaintiffs and the other class members as end users.

95.     Privity, nevertheless, is not required in this case because Plaintiffs and the other class members are intended third-party beneficiaries of the agreements between Defendants and their dealers; specifically, they are the intended beneficiaries of Defendants' warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiff and the other class members.

96.     Plaintiffs and the other class members suffered and will suffer diminution in the value of their Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

### COUNT III
### Violation of California's Consumers Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq*. ("CLRA")
### (On Behalf of Plaintiff Bennett and the California Class)

97.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

98.     This claim is brought by Plaintiff Bennett on behalf of the California Class.

99.     Defendants are a "person," under Cal. Civ. Code § 1761(c).

100. Plaintiff is a "consumer," as defined by Cal. Civ. Code § 1761(d), who purchased or leased a Class Vehicle.

101. Defendants' conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of the Class Vehicles, or omitting material information, violates the CLRA. Specifically, Defendants violated the CLRA by omitting material facts and failing to disclose known issues with the 3G modem, engaging in the following practices proscribed by Civil Code § 1770(a) in transactions that were intended to result in, and did result in, the sale or lease of the Class Vehicles:

- representing that the Class Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;
- representing that the Class Vehicles are of a particular standard, quality, or grade if they are of another;
- advertising the Class Vehicles with intent not to sell them as advertised; and
- representing that the Class Vehicles have been supplied in accordance with previous representations when they have not.

102. Defendants violated the CLRA by selling and leasing Class Vehicles that they knew were equipped with a modem incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in advertisements and promotional materials because the inevitable decommissioning of cellular providers' outdated 3G network would render the vehicle modems nonfunctional. Defendants omitted from Plaintiff and other class members the material fact that Class Vehicles were sold with inadequate modems. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

103. Defendants knew, at the time they sold Plaintiff his vehicle, of the material fact that the vehicles were equipped with a modem that would fail in the ways described above, and that the realities about the modem's capabilities substantially diminished the quality, performance, safety, and lifespan of Plaintiff's and other class members' vehicles.

Defendants knew that the loss of viability of the modems was inevitable and certain based on pre-sale knowledge of planned obsolescence relating to the 3G network. Defendants' conduct in selling the Class Vehicles with a 3G-enabled modem knowing that it would be phased out, and omitting information about the same, was fraudulent, wanton, and malicious.

104.  Defendants' unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff and other class members suffering actual damage on account of receiving a car that lacked modems that would not be rendered useless through phasing out of 3G network support.

105.  Plaintiff and the other class members paid for a car that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, and which fell below the standards set by and described in Defendants' representations, Plaintiff and the other class members were damaged on account of receiving a car worth less than as represented. Plaintiff and the other class members suffered diminution in the value of Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

106.  Pursuant to § 1782 of the CLRA, on November 7, 2022, Plaintiff notified Defendants in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.

107.  Plaintiff does not seek damages by this claim at the present. However, if Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages, as appropriate.

108. Pursuant to § 1780(d) of the Act, attached hereto as **Exhibit A** is the affidavit showing that this action has been commenced in the proper forum.

**COUNT IV**
**Violation of California's Unfair Competition Law**
**California Business & Professions Code § 17200, *et seq*. ("UCL")**
**(On Behalf of Plaintiff Bennett and the Nationwide Class or, alternatively, the California Class)**

109. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

110. This claim is brought by Plaintiff Bennet on behalf of the Nationwide Class or, in the alternative, the California Class.

111. The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

112. In the course of conducting business, Defendants committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, refusing to repair or replace the Class Vehicle's nonoperational 3G modem, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and (16), and Business & Professions Code §§ 17200, et seq., 17500, *et seq.*, and the common law.

113. In the course of conducting business, Defendants committed "unfair" business practices by, among other things, misrepresenting and omitting material facts regarding the characteristics, capabilities, and benefits of Class Vehicles. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiff and other class members were harmed by this conduct, Defendants were unjustly enriched. As a result, Defendants' conduct is "unfair" as it has offended an established public policy. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

114. Defendants knew when Class Vehicles were first sold and leased that they were equipped with a modem that substantially diminished the quality, performance, and

safety and lifespan of the vehicles. Through pre-sale communications with cellular providers regarding the eventual decommissioning of their 3G network, and Defendants' general knowledge of the telecommunications industry's upgrade to 4G and 5G technology, before the Class Vehicles were introduced to the market Defendants knew of the planned decommissioning of the Class Vehicles' modem—i.e., that the inevitable decommissioning of the outdated 3G networks would render the vehicle modems nonfunctional.

115. Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California, resulting in harm to consumers. Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the UCL's "unfair" prong. There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

116. The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendants committed "fraudulent business act[s] or practices" by, among other things, prominently making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Class Vehicles.

117. Defendants' actions, claims, omissions, and misleading statements were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

118. Plaintiff was deceived as a result of his reliance on Defendants' material representations and omissions, which are described above. Plaintiff suffered injury in fact and lost money as a result of purchasing a deceptively advertised Class Vehicle by paying more than he should have and expending time, effort, and money to attempt to repair or replace his Class Vehicle's modem and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

119. Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

120. Plaintiff, on behalf of himself and all others similarly situated, seeks restitution from Defendants of all money obtained from Plaintiff and the other members of the Class collected as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## COUNT V
### Fraudulent Omission
### (On Behalf of Plaintiff Bennett and the Classes)

121. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122. This claim is brought by Plaintiffs on behalf of the Nationwide Class and the New York and California Classes.

123. Defendants knew that the Class Vehicles' modems were equipped with outdated technology that would be rendered useless, would fail, and were not suitable for their intended use, and that this would lead to the failure of key features like the those accessed through the mobile application.

124. Defendants concealed from and failed to disclose to Plaintiff and class members the true nature of Class Vehicles' modem.

125. Defendants were under a duty to Plaintiff and class members to disclose the true nature of Class Vehicles' modem because:

- Defendants were in a superior position to know the true state of facts about the Class Vehicles' modem;

- Defendants made partial disclosures about the quality of Class Vehicles without revealing the true nature of the modem; and

- Defendants actively concealed the true nature of the Class Vehicles' modem from Plaintiff and other class members.

126. The facts concealed or not disclosed by Defendants to Plaintiff and the other class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Had Plaintiff and class members known about the true nature of Class Vehicles' modem, i.e., that they would be phased out and decommissioned, they would not have purchased or leased Class Vehicles, or would have paid less for them.

127. Defendants concealed or failed to disclose the true nature of this issue with the Class Vehicles' modem in order to induce Plaintiff and class members to purchase or lease Class Vehicles. Plaintiff and the other class members justifiably relied on Defendants' omissions to their detriment. This detriment is evident from Plaintiff's and class members' purchase or lease of the Class Vehicles.

128. As a direct and proximate result of Defendants' misconduct, Plaintiff and class members have suffered and will continue to suffer actual damages.

**COUNT VI**
**Violation of the New York Deceptive Practices Act**
**N.Y. Gen. Bus. Law § 349 ("GBL")**
**(On Behalf of Plaintiff Welikson and the New York Class)**

129. Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

130. This claim is brought by Plaintiff Welikson on behalf of the New York Class.

131. Plaintiff Welikson and New York class members are "persons" within the meaning of the GBL. N.Y. Gen. Bus. Law § 349(h).

132. Each Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. N.Y. Gen. Bus. Law § 349(b).

133. Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

134. In the course of Defendants' business, they failed to disclose and actively concealed that Class Vehicles are equipped with 3G compatible modems that would be phased out and "bricked" or rendered useless through 3G decommissioning. Defendants

did so with the intent that consumers rely on its misrepresentation and concealment in deciding whether to purchase the Class Vehicles.

135. By intentionally concealing the foregoing, while advertising Class Vehicles 3G network enabled features as functional, premium services, and fit for their ordinary and intended purpose, Defendants engaged in deceptive acts or practices in violation of GBL § 349.

136. Defendants' deceptive acts or practices were materially misleading. The conduct was likely to and did deceive reasonable consumers, including Plaintiff Welikson, about the true performance and qualities of the Class Vehicles.

137. Plaintiff Welikson and New York class members were unaware of, and lacked a reasonable means of discovering, the material facts that Defendants suppressed. Had Plaintiff and New York class members known the truth about the Class Vehicles, they would not have purchased them, or would not have paid as much for them as they did.

138. Defendants' actions set forth above occurred in the conduct of trade or commerce.

139. Defendants' misleading conduct concerns widely purchased consumer products and affects the public interest. Defendants' conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

140. Plaintiff Welikson and New York class members suffered ascertainable loss as a direct and proximate result of Defendants' GBL violations. Among other things, Plaintiff Welikson and New York class members overpaid for the Class Vehicles; suffered diminution of value of their Class Vehicles; have lost use of safety features; and have suffered other injuries. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

141. Plaintiff Welikson, individually and on behalf of the New York Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair and deceptive practices.

142.    Under the GBL, Plaintiff Welikson and New York class members are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Defendants acted willfully or knowingly, Plaintiff Welikson and New York class members are entitled to recover three times their actual damages. Plaintiff Cole Welikson is entitled to reasonable attorneys' fees.

**COUNT VII**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

143.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

144.    This claim is brought by Plaintiffs on behalf of the Nationwide Class and the New York and California Classes.

145.    This claim is pleaded in the alternative to the other claims pleaded herein.

146.    As described herein, Defendants marketed, distributed, and sold the Class Vehicles, as equipped with internet-enabled safety and other features, without disclosing the truth about the inevitable and foreseeable termination of their operability, namely that the Class Vehicles had telematics equipment that would be "bricked" and rendered useless upon the sunsetting of 3G infrastructure.

147.    As a direct and proximate result of Defendants' omissions concerning the obsolete telematics equipment and refusal to upgrade such equipment, Defendants have profited and benefited from the sale and lease of the Class Vehicles. Although these Vehicles are purchased through Defendants' agents, the money from the Vehicle sales flows directly back to Defendants.

148.    Plaintiffs and class members thus conferred a benefit upon, and thereby enriched, Defendants in exchange for Class Vehicles that are equipped with useless 3G modems.

149.    Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct, Plaintiffs

and the class members were not receiving products of the quality, nature, fitness, or value that had been represented by Defendant, and that reasonable consumers expected.

150.   As a result of Defendants' unjust enrichment, Plaintiffs and the class members have suffered damages.

151.   Defendants have been unjustly enriched by their fraudulent and deceptive withholding of benefits to Plaintiffs and the Class, at the expense of these parties. Defendants have been unjustly enriched in the amount of the difference in the price of the Class Vehicles with functioning models and internet enabled safety features and the price of the Class Vehicles with the disconnected 3G network.

152.   Equity and food conscience militate against allowing Defendants to retain their ill-gotten gains and require disgorgement and restitution of the same.

153.   Plaintiffs and class members are entitled to restitution of the profits unjustly obtained by Defendants, with interest.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A.   Certifying the Class under Federal Rule of Civil Procedure 23 as requested herein;

B.   Appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

C.   Finding that Defendants engaged in the unlawful conduct as alleged herein;

D.   Awarding Plaintiffs and the other class members actual, compensatory, and consequential damages;

E.   Awarding Plaintiffs and the other class members statutory damages;

F.   Awarding Plaintiffs and the other class members declaratory and injunctive relief;

G.   Awarding Plaintiffs and the other class members restitution and disgorgement;

H.  Awarding Plaintiffs and the other class members exemplary damages, should the finder of fact determine that Defendants acted with malice or oppression;

I.  Awarding Plaintiffs and the other class members pre-judgment and post-judgment interest on all amounts awarded;

J.  Awarding Plaintiffs and the other class members reasonable attorneys' fees, costs, and expenses; and

K.  Granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

Dated:  November 7, 2022            Respectfully submitted,

*/s/ Tina Wolfson*
TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
ROBERT R. AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
DEBORAH DE VILLA (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Attorneys for Plaintiffs and the Putative Classes*